No. 25-1878

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SEGA OF AMERICA, INC.,
*Plaintiff-Appellee,*

v.

CONSOVOY MCCARTHY PLLC,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 1:25-cv-00257 (Hilton, J.)

## CORRECTED BRIEF OF APPELLANT CONSOVOY MCCARTHY PLLC

Thomas R. McCarthy
Bryan Weir
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
tom@consovoymccarthy.com
October 17, 2025                bryan@consovoymccarthy.com

*Counsel for Appellant Consovoy McCarthy PLLC*

No. 25-1878, *Sega of America, Inc. v. Consovoy McCarthy PLLC*

## CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellant Consovoy McCarthy, PLLC certifies that it has no parent corporation, and no corporation owns 10% or more of its stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Bryan Weir*
Counsel for Consovoy McCarthy PLLC
Dated: October 17, 2025

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... I

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT .......................................................................... 2

STATEMENT OF THE ISSUES .............................................................................. 3

STATEMENT OF THE CASE .................................................................................. 3

    A.  Factual Background ............................................................................. 3

        1.  Companies who require consumers to arbitrate disputes often resist honoring their commitment. ............................................................. 3

        2.  Consovoy's clients file arbitration demands against Sega and prevail on a petition to compel arbitration in Los Angeles Superior Court..... 7

        3.  Sega sues Consovoy for filing its clients' arbitration demands and the successful petition to compel arbitration. ........................................... 9

    B.  Procedural Background......................................................................... 11

STANDARD OF REVIEW ..................................................................................... 13

SUMMARY OF ARGUMENT .............................................................................. 14

ARGUMENT ....................................................................................................... 21

I.  The Fourth Circuit has appellate jurisdiction. .................................................. 21

    A.  Consovoy's litigation privilege defense to Sega's state-law claims is an "immunity from suit" that supports appellate jurisdiction. ..................... 22

    B.  Consovoy's *Noerr-Pennington* defense to Sega's Lanham Act claim supports appellate jurisdiction. ............................................................. 23

        1.  *Noerr-Pennington* is an "immunity from suit" and that establishes appellate jurisdiction........................................................................ 23

        2.  The Court has pendent appellate jurisdiction if it concludes *Noerr-Pennington* is not an "immunity from suit."..................................... 25

II.  The litigation privilege bars Sega's three state-law claims.............................. 27

    A.  California law applies to Sega's state-law claims. .................................. 27

    B.  California's litigation privilege bars Sega's three state-law claims........ 31

        1.  The litigation privilege bars Sega's two claims for tortious interference because they both seek to hold Consovoy liable for "the filing of a legal action." ................................................................... 31

2. The litigation privilege bars Sega's false advertising claim because Consovoy's advertisements are protected pre-suit activity. ..............37

III. *Noerr-Pennington* immunity bars Sega's Lanham Act claim. ..........................38

A. *Noerr-Pennington* immunity bars Sega's Lanham Act claim because Consovoy's advertisements are protected pre-suit activity. ...................38

B. Sega's arguments against applying *Noerr-Pennington* immunity here fail. ...................................................................................... 41

CONCLUSION ................................................................48

STATEMENT REGARDING ORAL ARGUMENT ............................................49

CERTIFICATE OF COMPLIANCE ....................................49

CERTIFICATE OF SERVICE................................................49

# TABLE OF AUTHORITIES

**Cases**

*Abernathy v. DoorDash, Inc.*,
438 F. Supp. 3d 1062 (N.D. Cal. 2020) ..........................................5, 47

*Acoustic Systems, Inc. v. Wenger Corp.*,
207 F.3d 287 (5th Cir. 2000).............................................................25

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
41 Cal. 4th 1232 (2007)...............................................................*passim*

*Adams v. Postmates, Inc.*,
414 F. Supp. 3d 1246 (N.D. Cal. 2019) ..............................................6

*AirHawk Int'l, LLC v. TheRealCraigJ, LLC*,
2017 WL 3891214 (C.D. Cal. Jan. 19, 2017)....................................40

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ...............................................................15, 23

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ..........................................................................3

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001)...........................................20, 39, 42, 44

*BE & K Const. Co. v. NLRB*,
536 U.S. 516 (2002) .............................................................15, 23, 39

*Biggins v. Newlee*,
2011 WL 5842849 (Cal. Ct. App. Nov. 22, 2011)............................34

*Bill Johnson's Restaurants, Inc. v. NLRB*,
461 U.S. 731 (1983) ...................................................................15, 24

*Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*,
472 F. Supp. 2d 740 (E.D. Va. 2007).................................................30

*Catanzarite L. Corp. v. Michelman & Robinson, LLP*,
2015 WL 729374 (Cal. Ct. App. Feb. 19, 2015).................................34

*Champion Int'l Corp. v. United Paperworks Int'l Union, AFL-CIO,*
  168 F.3d 725 (4th Cir. 1999) .................................................................42

*Coastal States Mktg., Inc. v. Hunt,*
  694 F.2d 1358 (5th Cir. 1983) ..........................................................18, 39

*Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP,*
  440 F. Supp. 2d 1184 (D. Nev. 2006) ................................................33

*Davis v. City of Greensboro,*
  770 F.3d 278 (4th Cir. 2014) ..........................................................22, 23

*DoorDash, Inc. v. Plascencia,*
  2023 WL 2801677 (Cal. Super. Ct. Apr. 3, 2023) ...........................1, 8

*Eurotech, Inc. v. Cosmos Eur. Travels Aktiengesellschaft,*
  189 F. Supp. 2d 385 (E.D. Va. 2002) ................................................42

*Evans v. Chalmers,*
  703 F.3d 636 (4th Cir. 2012) ..........................................................14, 21

*Ficker v. Curran,*
  119 F.3d 1150 (4th Cir. 1997) ...........................................................39

*Ford Motor Co. v. Nat'l Indem. Co.,*
  972 F. Supp. 2d 862 (E.D. Va. 2013) .........................................19, 28, 29, 42

*Gen. Assur. Of Am., Inc. v. Overy-Seawell Co.,*
  533 F. App'x 200 (4th Cir. 2013) ....................................................16, 28

*Green Tree Fin. Corp.-Ala. v. Randolph,*
  531 U.S. 79 (2000) ...............................................................................4

*Grippa v. Rubin,*
  133 F.4th 1186 (11th Cir. 2025) ........................................................22

*Hensley on behalf of N. Carolina v. Price,*
  876 F.3d 573 (4th Cir. 2017) ..............................................................26

*Hensley, et al. v. Sega of America, Inc.,*
  2024 WL 5466122 (Cal. Super. Ct. Nov. 21, 2024) ...................*passim*

*Hinshaw v. Smith*,
436 F.3d 997 (8th Cir. 2006) ...............................................................25

*Hohenshelt v. Superior Ct. of Los Angeles Cnty.*,
573 P.3d 944 (Cal. Aug. 11, 2025) .................................................6, 47

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
335 F.3d 303 (4th Cir. 2003) ...........................................................18, 23

*Intuit Inc. v. 9,933 individuals*,
2020 WL 7094231 (Cal. Super. Ct. Oct. 6, 2020) ...............................6

*Jordan v. Shaw Indus., Inc.*,
131 F.3d 134 (4th Cir. 1997) .......................................................16, 17, 30

*Liapes v. Facebook, Inc.*,
95 Cal. App. 5th 910 (2023) ........................................................21, 35, 46

*Martin v. Gingerbread House, Inc.*,
977 F.2d 1405 (10th Cir. 1992) .........................................................24

*Moore v. Conliffe*,
7 Cal. 4th 634 (1998) ....................................................................14, 22

*Navient Sols., LLC v. Lohman*,
136 F.4th 518 (4th Cir. 2025) ......................................................*passim*

*Nero v. Mosby*,
890 F.3d 106 (4th Cir. 2018) ......................................................13, 22, 27

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
711 F.3d 1136 (9th Cir. 2013) ...........................................................25

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ......................................................................16, 24

*Parrish v. Latham & Watkins*,
3 Cal. 5th 767 (2017) ..........................................................................35

*People v. Potter Handy, LLP*,
97 Cal. App. 5th 938 (2023) ...............................................................31

*Perdue v. Croker Nat'l Bank*,
    38 Cal. 3d 913 (1985) ...................................................................30

*Philips v. Pitt Cnty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) .......................................................14

*Primetime 24 Joint Venture v. Nat'l Broad., Co.*,
    219 F.3d 92 (2d Cir. 2000) ..........................................................39

*Quillen v. Int'l Playtex, Inc.*,
    789 F.2d 1041 (4th Cir. 1986) ...............................................16, 28

*R.A. v. Hohnson*,
    36 F.4th 537 (4th Cir. 2022) ...................................................14, 22

*Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*,
    407 F.3d 631 (4th Cir. 2005) .......................................................28

*Robinson v. Volkswagenwerk AG*,
    940 F.2d 1369 (10th Cir. 1991) ..................................................22

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993) ...........................................................*passim*

*Rusheen v. Cohen*,
    37 Cal. 4th 1048 (2006) ....................................................18, 37, 38

*Rux v. Republic of Sudan*,
    461 F.3d 461 (4th Cir. 2006) .......................................................26

*S. Middlesex Opportunity Council, Inc. v. Town of Framingham*,
    752 F. Supp. 2d 85 (D. Mass. 2010) ...........................................25

*Schick v. Lerner*,
    193 Cal. App. 3d 1321 (1987) ....................................................33

*Scott v. Fam. Dollar Stores, Inc.*,
    733 F.3d 105 (4th Cir. 2013) .......................................................26

*Shanks v. AlliedSignal, Inc.*,
    169 F.3d 988 (5th Cir. 1999) .......................................................22

*Sierra Nat. Ins. Holdings, Inc. v. Credit Lyonnais S.A.*,
    64 F. App'x 6 (9th Cir. 2003) ........................................................14, 22

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990) ............................................................17, 31, 32

*Sliding Door Co. v. KLS Doors, LLC*,
    2013 WL 2090298 (C.D. Cal. May 1, 2013) ..........................................40

*Smith v. Mcdonald*,
    737 F.2d 427 (4th Cir. 1984) ......................................................15, 25

*Sosa v. DirecTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ..................................................18, 39, 42

*Uber Tech., Inc. v. Am. Arb. Ass'n, Inc.*,
    167 N.Y.S.3d 66 (N.Y. Sup. Ct. 2022) ...................................................6

*UCP Int'l Co. v. Balsam Brands Inc.*,
    420 F. Supp. 3d 966 (N.D. Cal. 2019) ..................................................40

*Valve Corp. v. Bucher Law PLLC*,
    34 Wash. App. 2d 727 (2025) ......................................................36, 37

*Van Cauwenberghe v. Biard*,
    486 U.S. 517 (1988) ................................................................15, 23

*Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*,
    984 F.2d 113 (4th Cir. 1993) ..............................................................43

*Wahi v. Charleston Area Med. Ctr., Inc.*,
    562 F.3d 599 (4th Cir. 2009) ..............................................................13

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) .............................................20, 43, 44, 45

*We, Inc. v. City of Philadelphia*,
    174 F.3d 322 (3d Cir. 1999) ..............................................................25

*Westfield Partners, Ltd. v. Hogan*,
    740 F. Supp. 523 (N.D. Ill. 1990) ......................................................24

**Statutes**

9 U.S.C. §§1-16...........................................................................19, 42, 43

28 U.S.C. §1291 ...........................................................................................3

28 U.S.C. §1332 ...........................................................................................2

28 U.S.C. §1367 ...........................................................................................3

Cal. Civ. Proc. Code §1281.97(a)(1)........................................................7

Cal. Civ. Proc. Code §1281.97(a)(2)....................................................7, 8

## OTHER AUTHORITIES

Amicus Brief of the Chamber of Commerce of the U.S.,
   *Am. Express Co. v. Italian Colors Rest.*, 2012 WL 6759408 (U.S. 2012) ............4

Amicus Brief of the Chamber of Commerce of the U.S.,
   *Green Tree Fin. Corp. v. Bazzle*, 2003 WL 721691 (U.S. 2003).....................4, 5

J. Maria Glover, *Mass Arbitration*,
   74 Stan. L. Rev. 1283 (2022) ..............................................................5

Restatement of Conflict of Laws §377 (1934) .................................................16, 30

**INTRODUCTION**

Consovoy McCarthy PLLC is a law firm that regularly represents consumers in arbitration against big companies. *See, e.g., DoorDash, Inc. v. Plascencia*, 2023 WL 2801677, at *1 (Cal. Super. Ct. Apr. 3, 2023) (confirming arbitration award of $4,876,000 for 78 of Consovoy's clients). Since early 2024, Consovoy has represented California consumers with California-based claims against Sega of America, Inc. In April of 2024, Consovoy filed its clients' arbitration demands against Sega pursuant to the terms of Sega's own arbitration agreement. And after Sega refused to arbitrate, Consovoy then filed a petition to compel arbitration in Los Angeles Superior Court on its clients' behalf. That court granted the petition and compelled Sega to arbitrate with Consovoy's clients. The California appellate courts declined to review—much less disturb—the trial court's ruling.

Having been compelled to arbitrate and without any further appeal, Sega embarked upon a scorched-earth legal strategy. It brought a collateral action in California state court against Consovoy's clients (which has now also been compelled to arbitration). It sued JAMS (the arbitration provider) for invoicing it for the arbitrations (as required under California law). And most relevant here, Sega took the extraordinary step of suing *Consovoy* itself in the Eastern District of Virginia. Sega claims that Consovoy should be held liable merely for doing what lawyers do every day for their clients: filing its clients' arbitration demands and a

*successful* petition to compel arbitration, as well as for seeking out those clients in the first place. Remarkably, Sega conceded that it brought this lawsuit to interfere with Consovoy's ability to continue litigating its clients' pending cases against Sega.

Sega's lawsuit against Consovoy is a direct attack on the attorney-client relationship and the foundation of the civil justice system. Given Sega's outlandish legal theory—that attorneys can be held liable to a defendant for representing their clients in litigation against that same defendant—it is unsurprising that there are immunities that bar Sega's claims. Relevant here, Consovoy filed a motion to dismiss that explained California's litigation privilege bars Sega's state law claims and *Noerr-Pennington* immunity bars Sega's federal claim. The district court, however, denied that motion without a hearing in a two-line order devoid of any analysis. Consovoy appealed that denial under the collateral order doctrine. This Court should reverse and hold that Sega's claims be dismissed so that Consovoy can continue representing its clients free from the burdens of Sega's improper lawsuit.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because Plaintiff-Appellee Sega of America, Inc. alleges complete diversity of citizenship between the parties and that the amount in controversy exceeds $75,000. 28 U.S.C. §1332. The district court also had jurisdiction because Sega alleges one claim arising under federal law, 28 U.S.C. §1331, and it evoked principles of supplemental jurisdiction over its state law claims,

28 U.S.C. §1367. The district court denied Consovoy's motion to dismiss on July 31, 2025, and Consovoy appealed the next day. JA005. The order is immediately appealable under 28 U.S.C. §1291 and the collateral order doctrine because the district court rejected Consovoy's immunities from suit. *See infra* Argument §I.

## STATEMENT OF THE ISSUES

**I.** Whether California's litigation privilege bars Sega's state claims for tortious interference with contract and false advertising.

**II.** Whether *Noerr-Pennington* immunity bars Sega's false advertising claim under the Lanham Act.

## STATEMENT OF THE CASE

### A. Factual Background

**1. Companies who require consumers to arbitrate disputes often resist honoring their commitment.**

Sophisticated corporations understand that they can minimize legal exposure by blocking class action lawsuits. By forcing consumers to agree to arbitration as part of their terms of service, companies can largely eliminate their incentive to pursue isolated claims against the companies. That practice reached its zenith after the Supreme Court held that States cannot condition the enforceability of arbitration agreements on the availability of class-wide procedures. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 351 (2011).

Companies and their proxies justified the legality of these arrangements in several ways. They first told the Supreme Court that large numbers of plaintiffs could pool resources and share costs to make individualized arbitration more economical. The Chamber of Commerce, for instance, cited the example of attorneys representing "over 1,000 claimants—each making virtually identical allegations" against AT&T. *See* Amicus Brief of the Chamber of Commerce of the U.S., *Am. Express Co. v. Italian Colors Rest.*, 2012 WL 6759408, at *29 (U.S. 2012). It lauded how the "Internet and social media can be used effectively to reach out to potential claimants ... [and to] identify other businesses or individuals with similar claims who can share in the costs of pursuing claims." *Id.* at 30. The naysayers were "mistaken in concluding that class actions ... are the only effective means ... of proving small claims." *Id.*

Pursuing arbitrations costs money, however. Arbitral forums impose fees for facilitating arbitration. Courts have been concerned that those fees "could preclude a litigant ... from effectively vindicating her … rights" because arbitration can be more expensive than court. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000). Companies and their proxies had a solution for that problem too. They have long told courts that arbitral fees are no barrier because companies generally agree to pay some or all those fees. *See, e.g.*, Amicus Brief of the Chamber of Commerce of the U.S., *Green Tree Fin. Corp. v. Bazzle*, 2003 WL 721691, at *7-8

(U.S. 2003). "Such [agreements to pay] substantially reduce (if not entirely eliminate) any financial barrier facing an arbitral client." *Id.* Companies and their proxies have also told courts that the arbitral forums themselves set the claimant's fees quite low or otherwise allow for fee waivers. "With such contractual and institutional protections available," they have argued, "there is no need to impose class action procedures … to protect consumers." *Id.* at *8. "Nor is there any reason to think that individual arbitration will 'choke off the supply of lawyers willing to pursue claims.'" *Id.*

Some lawyers have accepted the business community's proposal and have undertaken the effort and expense to arbitrate thousands of individual claims in arbitration. *See generally* J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1303 (2022). The business community—contrary to its prior representations—doesn't like that either. Businesses now complain about "mass arbitrations" and the fees they must pay to litigate them—fees that the companies themselves adopted and agreed to pay in the arbitration agreements they drafted. Courts have recognized those defendants' duplicity. For example, one judge blasted the "irony" that a company "faced with having to actually honor its side of the bargain, now blanches at the cost" because it "never expected that so many would actually seek arbitration." *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067-68 (N.D. Cal. 2020). That judge is hardly alone. *See, e.g.*, *Intuit Inc. v. 9,933 individuals*, 2020 WL 7094231,

at *13 (Cal. Super. Ct. Oct. 6, 2020) (company was "like the dog that caught the car" after forcing "claims out of class litigation and into arbitration"); *Uber Tech., Inc. v. Am. Arb. Ass'n, Inc.*, 167 N.Y.S.3d 66, 70 (N.Y. Sup. Ct. 2022); *Adams v. Postmates, Inc.*, 414 F. Supp. 3d 1246, 1252 n.2 (N.D. Cal. 2019).

The California Legislature shares these courts' ire. A few years ago, it identified a "very specific problem—namely, the procedural limbo and delay that consumers and employees face when they are forced to submit to mandatory arbitration to resolve a dispute, and the business or company that pushed the case into an arbitral forum then stalls or obstructs the arbitration proceeding by refusing to pay the required fees." *Hohenshelt v. Superior Ct. of Los Angeles Cnty.*, 573 P.3d 944, 953 (Cal. Aug. 11, 2025) (cleaned up). That concern was specifically directed at matters where thousands of individual claimants file arbitrations against one company. *Id.* "The Legislature noted instances in which companies, having drafted and enforced waivers of class proceedings … *faced large numbers of individual arbitration demands* and then failed to timely pay arbitration fees, thereby frustrating adjudication of [claimants'] claims." *Id.* (emphasis added); *see also id.* (pointing to an example where 2,800 individuals filed arbitration demands against Chipotle which "frustrat[ed] the efforts of its employees to have their claims adjudicated by failing to pay its share of the filing fee"). California passed several laws to address that problem. *Hohenshelt*, 573 P.3d at 953-54. Most relevant here, "[a]fter an

employee or consumer meets the filing requirements necessary to initiate an arbitration, the arbitration provider shall immediately provide an invoice for any fees and costs required before the arbitration can proceed to all of the parties to the arbitration." Cal. Civ. Proc. Code §1281.97(a)(2). The Legislature also requires that those fees be paid within 30 days. *Id.* §1281.97(a)(1).

> **2.    Consovoy's clients file arbitration demands against Sega and prevail on a petition to compel arbitration in Los Angeles Superior Court.**

This case arises against that backdrop. Sega of America, Inc is a California-based company whose primary business is developing video games. JA080, ¶5; JA087, ¶28. Sega follows the industry model on arbitration agreements. Pursuant to its End User License Agreement (or "EULA"), Sega requires anyone playing its games to waive their right to class actions and instead forces those players to file any claims against Sega in individual arbitration. JA110-11, §19. Sega chose JAMS as its arbitral provider, *id.*, and it selected California as the governing law: "Any dispute arising out of or related to this Agreement shall be governed in all respects by the laws of the State of California … without regard to conflict of law provisions." JA111, §20. The EULA also provides that "[t]he parties understand that, in some instances, the costs of arbitration could exceed the costs of litigation." JA110, §19.

Consovoy McCarthy PLLC is a law firm that regularly represents consumers in litigation and arbitration against large companies. *See, e.g., Plascencia*, 2023 WL

2801677, at *1 (confirming arbitration award of $4,876,000 for 78 of Consovoy's clients). Since early 2024, Consovoy has represented over 19,000 Californians who played Sega's mobile games. JA094, ¶54; JA117-27. Consovoy's clients each have claims against Sega arising out of their use of those games. JA095, ¶56. Pursuant to the EULA and JAMS's rules, Consovoy filed individual demands against Sega in April 2024 on behalf of its clients. JA094, ¶54.

JAMS evaluated the demands and determined that all Consovoy's clients had met the necessary filing requirements. JA097, ¶62. At that stage, California law required JAMS to invoice Sega for the filing fees needed to get the arbitrations started. *See* Cal. Civ. Proc. Code §1281.97(a)(2). JAMS's fee schedule states that "[t]he filing fee for two-party matters is $2,000." JA082, ¶15. JAMS thus issued Sega an invoice to pay $39,082,000 in filing fees to start the arbitrations that Consovoy's clients filed. JA097, ¶62

Sega refused to pay the invoice and arbitrate with Consovoy's clients. JA098, ¶67. That refusal forced Consovoy to file a petition to compel arbitration in Los Angeles Superior Court on its clients' behalf. JA098, ¶69; *see Hensley, et al. v. Sega of America, Inc.*, 2024 WL 5466122 (Cal. Super. Ct. Nov. 21, 2024) ("*Hensley* petition"). The court granted the petition and compelled Sega to arbitrate with Consovoy's clients. *See Hensley*, 2024 WL 5466122, at *7. The court held that Consovoy's clients "demonstrate[d] by a preponderance [of] the evidence that an

8

agreement to arbitrate exists." *Id.* at *6. The court reached that holding because Consovoy submitted, among other things, almost 30,000 declarations on behalf of its clients. *Id.* at *2, *7. It's been 18 months since Consovoy filed its clients' arbitrations, and all but ten of them (over 19,000) are still waiting for Sega to pay the fees required to initiate the arbitrations.

### 3. Sega sues Consovoy for filing its clients' arbitration demands and the successful petition to compel arbitration.

Sega responded to its loss by launching a scorched-Earth litigation campaign. One component of that strategy was suing Consovoy in this case. Here, Sega claims that Consovoy *itself* should be liable for representing its clients against Sega in their arbitrations and Los Angeles Superior Court.

*First*, Sega asserts in Count I that Consovoy's clients breached Sega's EULA merely by filing the successful *Hensley* petition to compel arbitration. JA100, ¶¶74-80. Sega's theory is that its EULA states that "[y]ou cannot bring a claim against Sega as a plaintiff or class member in a class action or any other collective, consolidated, or representative action." JA088, ¶32; JA099, ¶70. And Consovoy's clients allegedly breached that provision by filing their *Hensley* petition to compel arbitration because the petition was a "consolidated" action. JA099, ¶70. In this case, Sega attacks Consovoy's role in that supposed breach: It alleges "Consovoy intentionally induced [its clients] that agreed to the EULA to breach it by making the decision to file Claimants' demands in a single, consolidated petition." JA100,

¶77. Said differently, Sega alleges that Consovoy tortiously interfered with its clients' and Sega's EULA by filing a *successful* petition to compel arbitration pursuant to that same EULA. According to Sega, then, Consovoy should be held liable for successfully representing its clients in L.A. Superior Court.[1]

*Second*, Sega asserts in Count II that JAMS breached a purported contract with Sega by issuing the invoice for Consovoy's clients' arbitration demands pursuant to California law. JA101-03, ¶¶81-93. Here again, Sega attacks Consovoy's role in that supposed breach. It claims that "Consovoy intentionally induced JAMS to breach its contract with Sega by making the decision to submit 19,541 individual demands for arbitration with JAMS." JA101, ¶87. Sega asserts that claim even though SEGA's own EULA requires any arbitration demands be filed with JAMS. JA088-89, ¶33. So like with Count I, Sega thinks Consovoy should be held liable merely for filing lawsuits on its clients' behalf.

*Third*, Sega asserts in Count III that Consovoy violated the Lanham Act by soliciting California clients using advertising about potential claims they have against Sega. JA103-04, ¶¶94-102. The first of those alleged advertisements stated that "[i]f you played any of the following [Sega] games, you may qualify for hundreds of dollars in compensation." JA091, ¶41. The second alleged

---

[1] Sega acknowledges that it raised its argument that the *Hensley* petition was a "consolidated" action "at oral argument in the *Hensley* action." JA150. The Los Angeles Superior Court granted the petition to compel anyway.

advertisements stated that "[y]ou likely qualify for hundreds of dollars in compensation" if the recipient of the advertisement played specific Sega games. JA091, ¶42. Sega claims those advertisements were false because playing Sega's games "would not necessarily entitle an individual consumer to arbitrate against Sega." JA103, ¶96. And Sega's purported injury is that those "advertisements had a material effect on the decision-making of consumers who would not have submitted claims against Sega," JA104, ¶98, *i.e.*, Consovoy successfully solicited too many clients with claims against Sega.

*Fourth*, Sega asserts in Count IV that Consovoy violated Virginia state false advertising law for the same reason as Sega's Lanham Act claim in Count III. JA104-05, ¶¶103-107.

### B.    Procedural Background.

Consovoy filed a comprehensive motion to dismiss Sega's claims under Rule 12(b)(6). *See* JA039-76. Relevant to this appeal, Consovoy explained how California law applies to Sega's state-law claims and California's litigation privilege is an immunity that bars those claims. JA052-56. "For well over a century, communications with 'some relation' to judicial proceedings have been absolutely immune from tort liability." *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993). And there is "no communication that is more clearly protected by the litigation privilege than the filing of a legal action." *Action Apartment Ass'n, Inc. v. City of Santa Monica*,

41 Cal. 4th 1232, 1249 (2007). Because Sega's three state-law claims against Consovoy (Counts I, II, and IV) rest on privileged acts—the filing of lawsuits on behalf of clients and soliciting those clients—Consovoy argued they are barred by the litigation privilege. *See* JA054-56.

Consovoy also argued that the federal analog to the litigation privilege—*Noerr-Pennington* immunity—barred Sega's lone federal claim under the Lanham Act (Count III). JA056-57. Consovoy explained that *Noerr-Pennington* "safeguards the First Amendment 'right to petition the government for redress of grievances' … by immunizing [parties] from the liability that may attend the exercise to rights." *Navient Sols., LLC v. Lohman*, 136 F.4th 518, 522 (4th Cir. 2025). Consovoy also outlined how the immunity "extends to petitioning the courts," and "as to pre-suit … conduct, courts have generally shown a willingness to immunize 'conduct incidental to the prosecution of the suit.'" *Id.* at 522, 525.

Judge Hilton set a hearing on Consovoy's motion to dismiss but cancelled it the day before. *See* D.Ct. Doc. 33; JA005. A week later he denied the motion in a two-line order without any analysis:

> THIS MATTER comes before the Court on Defendant Consovoy McCarthy PLLC's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). It appearing to the Court that the Complaint states a claim upon which recovery may be had, it is hereby ORDERED that Defendant's Motion to Dismiss is DENIED.

JA168. Consovoy filed a notice of appeal the next day. JA169-70.

Consovoy then filed a motion to stay the case in district court on two grounds. In response to that motion, Sega revealed the purpose of this lawsuit. It opposed a stay because "Consovoy's conduct is ongoing, including by facilitating the processing of [its clients'] demands in a manner violative of the EULA." D.Ct. Doc. 48, at 21. And Consovoy's continued representation of its clients "will cause Sega continuing harm that can only be remedied through this litigation." *Id.* The point of Sega's lawsuit, then, is to stop Consovoy from representing its clients in their own litigation against Sega. Judge Hilton denied Consovoy's motion to stay. *See* D.Ct. Doc. 50; JA006. Consovoy moved this Court to stay district court proceedings pending this appeal. As of the filing of this brief, the Court has not issued a decision on that motion to stay.

## STANDARD OF REVIEW

Appellate courts "review denials of absolute immunity de novo." *Nero v. Mosby*, 890 F.3d 106, 117 (4th Cir. 2018). At the motion to dismiss stage, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009). In its review, "the court need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions,

or arguments." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (cleaned up).

## SUMMARY OF ARGUMENT

**I.** This Court has appellate jurisdiction under the collateral order doctrine to address Consovoy's immunity defenses. This Court has held it has "appellate jurisdiction under the collateral order doctrine to review a district court's denial of those claims to which the defendants assert immunities 'from suit.'" *Evans v. Chalmers*, 703 F.3d 636, 655 (4th Cir. 2012). Consovoy's litigation privilege defense to Sega's three state-law claims arises under California law, and the Supreme Court of California has held that the litigation privilege is "an 'immunity' from suit." *Moore v. Conliffe*, 7 Cal. 4th 634, 638 n.1 (1998). This Court thus has jurisdiction to address Consovoy's litigation privilege defense because "[a]n order denying immunity is immediately appealable when, 'under state law, the immunity is an immunity from suit.'" *R.A. v. Johnson*, 36 F.4th 537, 541 (4th Cir. 2022); *see also Sierra Nat. Ins. Holdings, Inc. v. Credit Lyonnais S.A.*, 64 F. App'x 6, 7 (9th Cir. 2003) (holding that an appeal from a decision denying the defendant's California-based litigation privilege is immediately appealable).

Consovoy's *Noerr-Pennington* immunity to Sega's Lanham Act claim is also immediately appealable. To date, the Fourth Circuit has not addressed whether *Noerr-Pennington* is an "immunity from suit." And courts are split on that question.

In this context, this Court has held it has jurisdiction to address the defense in the first instance because (1) "[d]eferral would defeat [the defendant's] claim that he should not be put to trial, which is the initial protection of absolute privilege"; and (2) the appeal "presents a serious and unsettled question because other courts have concluded that a petitioner is entitled to absolute privilege." *Smith v. McDonald*, 737 F.2d 427, 428 (4th Cir. 1984).

The Court should find that *Noerr-Pennington* is an immunity from suit. "The critical question … is whether 'the essence' of the claimed right is a right not to stand trial." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988). The Supreme Court has recognized that the First Amendment right to petition—which includes the right to petition courts—is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002). The First Amendment also protects against actions that "chill" the exercise of the rights it protects *See, e.g.*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). And the Supreme Court has recognized that the burden of facing lawsuits that target protected activity have the power to chill the exercise of protected rights. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740 (1983). Having to face the burden of Sega's lawsuit, in other words, will infringe on protected First Amendment activity. That is precisely the outcome the Supreme Court sought to prevent, as it "crafted the *Noerr-Pennington* doctrine … to avoid chilling the

exercise of the First Amendment right to petition the government for the redress of grievances," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). *Noerr-Pennington* is an "immunity from suit" as a result, and denial of that immunity is immediately appealable.

**II.A** California law applies to Sega's state-law claims. Virginia's choice-of-law rules looks to the "place of the wrong" to "determin[e] which State's substantive law applies in a tort action brought in Virginia." *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). Sega's first two counts allege tortious interference of contract claims. For those, the "place of the injury" is where the underlying breach of contract occurred. *Gen. Assur. Of Am., Inc. v. Overy-Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013). Sega's theory for Count I is Consovoy induced its clients to breach Sega's EULA by filing the successful *Hensley* petition compel arbitration. Sega's theory for Count II is that Consovoy induced JAMS to breach a purported contract with Sega by filing its clients' arbitration demands with JAMS pursuant to Sega's own arbitration agreement. Because Consovoy filed the *Hensley* petition and its clients' arbitration demands in California, California law applies to Sega's claims.

The outcome is the same for Sega's false advertising claim. "When a person sustains a loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made." *Jordan v. Shaw Indus., Inc.*, 131 F.3d 134, at *3 (4th Cir. 1997) (table) (quoting Restatement of Conflict of Laws §377

(1934)). Courts should thus apply "the law of the State in which [the] plaintiff was headquartered." *Id*. Sega is "headquartered" in California so that is where Sega "sustained" the alleged loss. California law applies to Sega's false advertising claim as a result.

**II.B.** California's litigation privilege bars Sega's three-state law claims. "For well over a century, communications with 'some relation' to the judicial proceedings have been absolutely immune from tort liability." *Rubin*, 4 Cal. 4th at 1193. "The principal purpose" of the privilege "is to afford litigants and witnesses … the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal. 3d 205, 213 (1990). The Supreme Court of California has explained, as a result, that there is "no communication that is more clearly protected by litigation privilege than the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. Both of Sega's tortious interference claims seek to hold Consovoy liable for filing lawsuits on behalf of its clients—first filing their arbitration demands and the filing the *Hensley* petition. California's litigation privilege therefore bars both claims.

The privilege also bars Sega's false advertising claim. California has "given the privilege an expansive reach." *Rubin*, 4 Cal. 4th at 1193-94. The privilege extends beyond just filing lawsuits and includes "communications 'with some' relation to an anticipated lawsuit." *Id.* The Supreme Court of California has thus held

that the privilege applies to "attorney prelitigation solicitations of potential clients." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1058 (2006). Sega's false advertising claim seeks to hold Consovoy liable for its ads soliciting clients with claims against Sega. California's litigation privilege therefore bars that claim too.

**III.A.** *Noerr-Pennington* immunity similarly bars Sega's federal Lanham Act claim. "The *Noerr-Pennington* doctrine grants First Amendment immunity to those who engage in petitioning activity." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). "This includes the pursuit of litigation." *Id.* And courts have "generally shown a willingness to immunize 'conduct incidental to the prosecution of the suit'" to "give adequate 'breathing space' to the right to petition.'" *Navient Sols.*, 136 F.4th at 522 (quoting *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006)). "Given that petitioning immunity protects … litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation." *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983). As with its false advertising claim, Sega's Lanham Act claim seeks to hold Consovoy liable for its ads soliciting clients to pursue litigation against Sega. Because that is "conduct incidental to the prosecution of the suit," *Noerr-Pennington* immunity bars Sega's lone federal claim.

**B.1.** Sega proffered only two arguments below against *Noerr-Pennington*'s application here. Sega first argued that *Noerr-Pennington* immunity doesn't extend

to arbitrations. But that view fails at the outset. Sega's Lanham Act claim doesn't target the arbitration proceedings brought by Consovoy's clients. It targets the advertising through which Consovoy procured its clients. And Consovoy's alleged advertising led to Consovoy filing a court action on its clients' behalf—the successful *Hensley* petition. Thus, Sega's Lanham Act claim is not based on arbitrations.

*Noerr-Pennington* applies to arbitrations in any event. This Court hasn't yet decided that question yet. But courts have extended *Noerr-Pennington* to all manner of conduct incident to litigation separate from the venue where the parties' disputes are adjudicated. There is no reason to stop at arbitration. The courts that have not applied *Noerr-Pennington* to arbitration have done so because they thought arbitrations "do[] not petition the Government at all" through judicial proceedings. *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 862, 868 (E.D. Va. 2013). But arbitrations are always overseen by courts. An arbitral award, for example, has no effect absent a court confirming it and reducing it to judgment. And Congress otherwise gave courts a central role in arbitrations when it passed the Federal Arbitration Act. *See* 9 U.S.C. §§1-16. For these reasons, actions taken in arbitration necessarily must involve petitioning activity to courts.

**2.** Sega next argued that Consovoy shouldn't receive *Noerr-Pennington* immunity because its clients have engaged in "sham" litigation. Yet the only

litigation that has moved forward between Sega and Consovoy's clients was the successful *Hensley* petition. "By definition, a winning lawsuit is a 'reasonable effort at petitioning for redress and therefore not a sham.'" *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir. 2001). Sega argued below that Consovoy's clients' arbitrations are "sham" litigation. This argument also fails at the outset for three independent reasons. *First,* and again, Sega doesn't target any litigation with its Lanham Act claim; it seeks to hold Consovoy liable for its attorney advertising. The "sham" litigation exception doesn't apply when the challenged conduct isn't litigation. *Second*, one of the most important factors a plaintiff must establish to pierce *Noerr-Pennington* is the lawsuits were objectively meritless. To do that, courts look at the "win-loss percentage" of the collateral litigation alleged to be a sham. *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 365 (4th Cir. 2013). But here not a single arbitration by Consovoy's clients has even formally started yet. It is thus impossible for Sega to show that Consovoy's clients filed their arbitrations "without regard for the merits." *Id.* at 364. *Third*, Sega must show that Consovoy used the allegedly sham litigation "for the purpose of violating federal law." *Id.* Because Sega alleges a Lanham Act claim against Consovoy, Sega must allege that Consovoy used the arbitrations to accomplish its violation of the Lanham Act. But Sega doesn't allege that used the arbitrations as a

tool to violate the Lanham Act. That would be impossible because the alleged false advertising happened *before* Consovoy filed its clients' arbitrations.

Sega's view that the claims in arbitration are "baseless" is also wrong. Those claims exactly track a theory that the California Court of Appeal has approved. *See Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 920-27 (2023). Sega otherwise argued below that Consovoy merely filing thousands of arbitrations on behalf of its clients is "abusive" sham litigation. But lawyers filing mass arbitrations are doing exactly what the business community said to do when they justified class-action waivers in the first place. Mass arbitrations have been become a common vehicle for vindicating consumers' and employees' rights. And the California Legislature blessed mass arbitrations when it passed laws to ensure that companies like Sega pay the arbitration fees to ensure the arbitrations proceed. Mass arbitrations aren't "abusive"; they are the natural result of companies forcing their consumers and employees to waive their right to class actions and pursue individual arbitration instead.

## ARGUMENT

### I.     The Fourth Circuit has appellate jurisdiction.

This court has "appellate jurisdiction under the collateral order doctrine to review a district court's denial of those claims to which the defendants assert immunities 'from suit.'" *Evans*, 703 F.3d at 655. Both the litigation privilege and *Noerr-Pennington* provide "*immunity from suit* rather than a mere defense to

liability." *Davis v. City of Greensboro*, 770 F.3d 278, 281 (4th Cir. 2014). The district court's rejection of those immunities is thus immediately appealable.

**A.  Consovoy's litigation privilege defense to Sega's state-law claims is an "immunity from suit" that supports appellate jurisdiction.**

Start with Consovoy's litigation privilege defense. "To determine the nature and scope of an asserted state-law immunity, [courts] look to state substantive law." *Nero*, 890 F.3d at 121. Here, Consovoy's litigation privilege defense related to litigation activities in California arises under California law. *See infra* 27-30. The Supreme Court of California has expressly recognized that the litigation privilege is "an 'immunity' from suit," *Moore*, 7 Cal. 4th at 638 n.1. As a result, the Court has jurisdiction to address Consovoy's litigation privilege defense because "[a]n order denying immunity is immediately appealable when, under state law, the immunity is an immunity from suit,' not merely from liability." *R.A.*, 36 F.4th at 541. Indeed, four other circuits have agreed there is appellate jurisdiction under the collateral order doctrine to address the litigation privilege defense, including the Ninth Circuit addressing a denial of California's litigation privilege. *See Sierra Nat. Ins. Holdings*, 64 F. App'x at 7; *Grippa v. Rubin*, 133 F.4th 1186, 1196-97 (11th Cir. 2025); *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 992 (5th Cir. 1999); *Robinson v. Volkswagenwerk AG*, 940 F.2d 1369, 1370 (10th Cir. 1991). This Court should do the same.

## B. Consovoy's *Noerr-Pennington* defense to Sega's Lanham Act claim supports appellate jurisdiction.

### 1. *Noerr-Pennington* is an "immunity from suit" and that establishes appellate jurisdiction.

"The *Noerr-Pennington* doctrine grants First Amendment immunity to those who engage in petitioning activity." *IGEN Int'l*, 335 F.3d at 310. "This includes the pursuit of litigation, and, although originally developed in the antitrust context, the doctrine has now universally been applied to business torts." *Id.* (internal citation omitted). The denial of *Noerr-Pennington* immunity is immediately appealable because, like the litigation privilege, it is an immunity from suit.

The Fourth Circuit has not yet decided whether *Noerr-Pennington* "is an immunity from suit rather than a mere defense to liability." *Davis*, 770 F.3d at 281. But "[t]he critical question … is whether 'the essence' of the claimed right is a right not to stand trial." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988). The Supreme Court has recognized "the right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights, and that the "right of access to the courts … is one aspect of the right to petition." *BE & K Const.*, 536 U.S. at 524-25. The First Amendment also doesn't just protect against outright bans of the protected rights; it also protects against activities that "chill" the exercise of those rights. *See, e.g.*, *Ashcroft*, 535 U.S. at 244 ("The Constitution gives significant protection

from overbroad laws that chill speech within the First Amendment's vast and privileged sphere.").

For its part, the Supreme "Court has recognized the power of a lawsuit to chill the exercise of rights." *Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1407 (10th Cir. 1992) (citing *Bill Johnson's Restaurants*, 461 U.S. at 740. In *Bill Johnson*, for example, the Court explained that "[a] lawsuit no doubt may be used … as a powerful instrument of coercion or retaliation." *Id.* A lawsuit is "notice that anyone who engages in [protected] conduct is subjecting himself to the possibility of a burdensome lawsuit." *Id.* "Regardless of how unmeritorious the … suit is, the [defendant] will most likely have to retain counsel and incur substantial legal expenses to defend against it." *Id.* And "the chilling effect of a … lawsuit upon [a person's] willingness to engage in protected activity is multiplied where the complaint seeks damages." *Id.* at 741. Most relevant here, the Supreme Court specifically "crafted the *Noerr-Pennington* doctrine … to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Octane Fitness*, 572 U.S. at 556.

It is for these reasons that *Noerr-Pennington* is an immunity from suit. To be sure, courts are split on that question of whether *Noerr-Pennington* is immunity from suit or a defense to liability. *Compare Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523, 526 (N.D. Ill. 1990) ("As it has been developed, the *Noerr-Pennington*

doctrine creates an immunity from suit."), *and S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 112 (D. Mass. 2010) ("The *Noerr-Pennington* doctrine … provides immunity from suit."), *with Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136, 1140 (9th Cir. 2013) ("[T]he *Noerr-Pennington* doctrine provides only a defense to liability."). The other circuits that have addressed this issue have concluded it is not an "immunity from suit." *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326 (3d Cir. 1999); *Acoustic Systems, Inc. v. Wenger Corp.*, 207 F.3d 287, 295 (5th Cir. 2000); *Hinshaw v. Smith*, 436 F.3d 997, 1003 (8th Cir. 2006). In this context—when a party argues it has immunity from suit and the Fourth Circuit has not addressed the question yet—this Court has held it has jurisdiction to address the defense in the first instance because (1) "[d]eferral would defeat [the defendant's] claim that he should not be put to trial, which is the initial protection of absolute privilege"; and (2) the appeal "presents a serious and unsettled question because other courts have concluded that a petitioner is entitled to absolute privilege." *Smith*, 737 F.2d at 428. This appeal meets those prerequisites, so the Court has jurisdiction to address the scope of Consovoy's *Noerr-Pennington* defense.

2.  **The Court has pendent appellate jurisdiction if it concludes *Noerr-Pennington* is not an "immunity from suit."**

Even if the Court concludes that it lacks appellate jurisdiction under the collateral order doctrine, the Court may "nevertheless may exercise appellate

jurisdiction under the doctrine of pendent appellate jurisdiction." *Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 586 n.7 (4th Cir. 2017). "Pendent appellate jurisdiction is 'a judicially-created, discretionary exception to the final judgment requirement.'" *Id.* (quoting *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006)). This exception applies "when an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal." *Id.* (cleaned up). "Claims are 'inextricably intertwined if the same specific question will underlie both the appealable and the non-appealable claims, such that resolution of the question will necessarily resolve both claims at once.'" *Id.* (quoting *Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013)).

Consovoy's assertion of *Noerr-Pennington* immunity is "inextricably intertwined" with its litigation privilege defense to Sega's state-law false advertising claim. To start with, Sega's state law and Lanham Act claims are based on the exact same facts and same legal theory. *Compare* JA103-04, ¶¶94-102, *with* JA104-05, ¶¶103-07. Both allege that the same advertisements had the capacity to be "false and misleading" by attracting too many of Consovoy's clients who sued Sega in arbitration. *Compare* JA103, ¶96, *with* JA104, ¶104.

Sega's state and federal false advertising claims further raise the same legal question for Consovoy's immunities. To determine whether the litigation privilege to applies, the Court must decide whether Sega's complaint targets conduct that has

"'some relation' to an anticipated lawsuit." *Rubin*, 4 Cal. 4th at 1194. The Court must decide the same question for *Noerr-Pennington* immunity: whether Sega's complaint targets "litigation-related activities preliminary to the formal filing of the litigation." *Navient Sols.*, 136 F.4th at 522.

This is the precise scenario for which pendent appellate jurisdiction exists. Issues are "inextricably intertwined" when a federal "claim is based on the same facts as their state [] claims," and the defendant's "federal and state absolute-immunity defenses raise identical issues." *Nero*, 890 F.3d at 123. And when the Court decides whether Sega's allegations about advertising are in anticipation of litigation, that holding will apply to both litigation privilege and *Noerr-Pennington*. The defenses, as with Sega's two false advertising claims, rise or fall together. The Court therefore has pendent appellate jurisdiction over Consovoy's *Noerr-Pennington* defense.

## II.   The litigation privilege bars Sega's three state-law claims.

### A.   California law applies to Sega's state-law claims.

**1.** California law applies to Sega's lawsuit because all the relevant conduct occurred there: Sega is headquartered in California; Consovoy's clients are all Californians; Consovoy filed its clients' arbitration with JAMS in California; and Consovoy filed the *Hensley* petition to compel arbitration in a Los Angeles Superior Court. *See* JA080, ¶5; JA083-84, ¶16, JA085, ¶¶22-23, JA095, ¶56; JA097, ¶63; JA098, ¶69; and JA117-129.

To that end, "[a] federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005). Virginia applies the "lex loci deliciti rule," which means that "the place of the wrong … determines which State's substantive law applies in a tort action brought in Virginia." *Quillen*, 789 F.2d at 1044. "The place of the wrong for purposes of the *lex loci delicti* rule … is defined as the place where 'the last event necessary to make an act liable for an alleged tort takes place.'" *Id.*

**2.** Sega's first two claims are for tortious interference with contract. Count I alleges that Consovoy induced its clients to breach Sega's EULA by filing the *Hensley* petition on their behalf in Los Angeles Superior Court. JA100, ¶¶74-80. Count II alleges that Consovoy induced JAMS to breach its purported contract with JAMS by filing its clients' arbitration demands with JAMS. JA101-03, ¶¶81-93.

"For claims of tortious interference with contract, the occurrence of the plaintiff's injury marks the last event necessary to establish liability." *Gen. Assur. of Am.*, 533 F. App'x at 206. And the plaintiff's injury occurs where the underlying breach of contract happened. *Id.* ("[W]e conclude that GAA's alleged injury occurred in North Carolina, the place where Tadkin Valley terminated its contract with GAA."). In other words, "a court must identify the state in which the breach occurred and apply the law of that state." *Ford Motor*, 972 F. Supp. 2d at 858. Sega

agreed below that "the 'wrongful act' is the 'breach of the contract between the plaintiff and its business counterparty,'" JA032. And Sega agreed that the "court must identify the state in which the breach occurred and apply the law of that state." JA033 (quoting *Ford Motor*, 972 F. Supp. 2d at 858).

The alleged breach of contract for Sega's tortious interference claims occurred in California. On Count I, Sega alleges that Consovoy's clients "materially breached [the EULA] by filing a single, consolidated petition to compel Sega to arbitrate." JA100, ¶79. Consovoy's clients filed that petition to compel in Los Angeles Superior Court. JA098, ¶69. The alleged breach therefore occurred in California, and its law applies as a result.

The same is true for Count II. That claim alleges that Sega is a California-based company had a contract with JAMS, which is also a California-based company. *See* JA080, ¶5; JA083-84, ¶16; JA085, ¶¶22-23; JA101, ¶¶82-87. Sega alleged that JAMS breached that contract by issuing Sega an invoice for the California-based arbitrations. JA101-03, ¶¶88-92. That alleged breach, as a result, also occurred in California. So California law governs Count II as well.

If there were any doubt on Sega's first two claims, Sega's own EULA and complaint confirm that California law applies. For Count I, Sega's EULA provides that "[a]ny dispute arising out of or related to this Agreement shall be governed in all respects by the laws of the State of California … without regard to conflict of law

provisions." JA111, §20. So California law governs the alleged breach by Consovoy's clients. And for Count II, Sega itself relies on California precedent for the underlying breach. *See* JA102, ¶90 (citing *Perdue v. Croker Nat'l Bank*, 38 Cal. 3d 913 (1985)).

**3.** Count IV is also governed by California law. That claim alleges that Consovoy engaged in false advertising by using ads to solicit potential California-based clients who had potential claims against Sega. *See* JA104-05, ¶104; *see also* JA083-84, ¶16; JA092, ¶43; JA093, ¶49; JA095, ¶56; JA097, ¶63; JA098, ¶69 n.27. "When a person sustains a loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made." *Jordan*, 131 F.3d at *3 (quoting Restatement of Conflict of Laws §377 (1934)). Court should thus apply "the law of the State in which [the] plaintiff was headquartered." *Id.*; *see also, e.g.*, *Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007) ("[T]he law of the forum where the party allegedly defrauded is headquartered governs tort claims as such locale is both the place where such party relied on the false representations and where its loss was sustained."). Here, Sega is "headquartered" in California. *See* JA080, ¶5. So that is where Sega "sustained" the alleged loss. California law applies to Sega's false advertising claim under state law as a result.

**B.     California's litigation privilege bars Sega's three state-law claims.**

**1.     The litigation privilege bars Sega's two claims for tortious interference because they both seek to hold Consovoy liable for "the filing of a legal action."**

**a.** "For well over a century, communications with 'some relation' to the judicial proceedings have been absolutely immune from tort liability." *Rubin*, 4 Cal. 4th at 1193. "The litigation privilege originated as a defense to liability for defamation, but it is now recognized as much broader in scope." *People v. Potter Handy, LLP*, 97 Cal. App. 5th 938, 947 (2023). "The principal purpose" of the privilege "is to afford litigants and witnesses … the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg*, 50 Cal. 3d at 213. "Since the external threat of liability is destructive of this fundamental right and inconsistent with the effective administration of justice … courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial," and more. *Id.* (cleaned up). The privilege is "the backbone to an effective and smoothly operating judicial system." *Id.* at 214-15 (cleaned up).

For these reasons, the Supreme Court of California has "emphasized the importance of the litigation privilege's absolute protection of access to the courts." *Action Apartment*, 41 Cal. 4th at 1244. It has therefore concluded there is "no communication *that is more clearly protected* by the litigation privilege than the

*filing of a legal action*." *Action Apartment*, 41 Cal. 4th at 1249 (emphasis added). "[T]he filing of a legal action" is "by its very nature is a communicative act." *Id.* And the litigation privilege protects against "all torts except malicious prosecution," including "intentional inducement of breach of contract." *Silberg*, 50 Cal. 3d at 212, 215.

The litigation privilege bars Sega's two claims for tortious interference with contract. Here again, Sega's first claim alleges that Consovoy tortiously interfered with Sega's contract with Consovoy's clients (the EULA) by "induc[ing]" the clients to file "a single, consolidated petition" to compel Sega to arbitrate, JA100, ¶77. The basis for Sega's first claim, in other words, is "the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. Sega's second count rests on the same protected conduct. Sega alleges that "Consovoy intentionally induced JAMS to breach its contract with Sega by making the decision to submit 19,541 demands for arbitration with JAMS." JA101, ¶¶87-88. Both of Sega's claims fall in the center of the privilege, and this Court should hold that the litigation privilege bars both of Sega's tortious interference claims as a result.

Moreover, the target of Sega's lawsuit—the law firm advising the party engaged in litigation rather than the party itself—renders Sega's claims doubly improper. The litigation privilege protects parties *and* their lawyers from tortious-interference claims premised on the filing of lawsuits. But California provides even

more protection to the lawyers. "[P]ublic policy dictates that attorneys must remain free to counsel their clients without fear of subjecting themselves to liability as a result of the proper discharge of their professional obligations." *Schick v. Lerner*, 193 Cal. App. 3d 1321, 1329 (1987). "Clients as well must feel free to seek out an attorney's advice on *any* issue at *any* time." *Id.* "Any rule to the contrary would constitute a serious impairment to the attorney-client relationship, and a resulting deleterious effect on the administration of justice." *Id.* "It is not difficult to imagine the consequences likely to follow in the wake of a rule permitting the defendant in a civil action to institute parallel litigation seeking to impose liability on the attorney for the adverse party." *Rubin*, 4 Cal. 4th at 1197-98. The "evils" of allowing lawsuits like Sega's to proceed would lead to "[t]he impairment of colorable claims by disrupting access to counsel, the intimidating effect on attorneys of facing an almost certain retaliatory proceeding, the distractions inherent in requiring counsel to deal with defending a personal countersuit as well as the predicate action and, in general, the dampening effect on the unobstructed presentation of claims." *Id.*

For these reasons, "California has recognized an attorney cannot be held liable for urging a client to breach a contract with a third party." *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1196 (D. Nev. 2006) (citing *Schick*, 193 Cal. App. 3d at 1329). So even if Sega "could establish the elements of a cause of action for interference with contractual relations," Sega "still could not

prevail" because it "is suing the law firm[] for legal advice [it] gave [its] clients." *Catanzarite L. Corp. v. Michelman & Robinson, LLP*, 2015 WL 729374, at *4 (Cal. Ct. App. Feb. 19, 2015); *see also Biggins v. Newlee*, 2011 WL 5842849, at *3 (Cal. Ct. App. Nov. 22, 2011) ("Not only is a party to a contract exempt from liability for interference or inducing breach, the attorney for the party is exempt as well."). This additional privilege that California affords attorneys for advising and representing their clients in litigation independently bars Sega's first two counts.

**b.** Sega didn't dispute below that there is "no communication that is more clearly protected by the litigation privilege than the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. Sega instead asked the district court to carve out an exception to the privilege for this case. It argued that the privilege doesn't apply where a plaintiff challenges the "act" or "manner" in which a claim is asserted. JA144-45. But the Supreme Court of California has carved out only one exception to the privilege's application to "the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. The privilege does "not extend … to actions for malicious prosecution." *Id.* at 1242. *That* is the correct claim for a party seeking to hold someone liable for filing a lawsuit. It requires the plaintiff to show that "[t]he underlying action must have been: (i) initiated or maintained by … the defendant, and pursued to a legal termination in favor of the malicious prosecution plaintiff; (ii) initiated or maintained without probable cause; and (iii) initiated or maintained with

malice." *Parrish v. Latham & Watkins*, 3 Cal. 5th 767, 775 (2017). The claim is an exception to the litigation privilege because "[t]he policy of encouraging free access to the courts that underlies the absolute privilege … is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied." *Action Apartment*, 41 Cal. 4th at 1242.

Yet Sega didn't pursue the only available exception to the litigation privilege and sue Consovoy for malicious prosecution. There's a reason for that: Sega knows it's a loser on the merits because Consovoy's clients *prevailed* on the *Hensley* petition to compel arbitration on which Sega's first tortious interference claim is based. *Hensley,* 2024 WL 5466122, at \*7. So Sega cannot show that the *Hensley* action terminated in its favor or lacked probable cause (or was brought with malice). And the arbitration demands filed by Consovoy's clients—which form the basis of Sega's second tortious interference claim—are still pending.[2] So Sega cannot

---

[2] Nor could Sega establish the claims brought by Consovoy's clients lack probable cause anyway. Their demands allege that Sega violated California's Unruh Civil Rights Act as outlined in *Liapes*, 95 Cal. App. 5th at 920-27. *See* JA120. Specifically, *Liapes* held that a company violates California law when it targets consumers with advertising based upon their protected characteristics, such as their gender and age. *See Liapes*, 95 Cal. App. 5th at 926 (explaining that Plaintiff alleged that "Facebook expressly relies on gender and age to determine the audience for its ads" and, as a result, "the complaint raises a plausible inference Facebook treated Liapes unequally because of her gender and age—a valid Unruh Civil Rights Act claim of intentional discrimination."). Each of Consovoy's clients have alleged that Sega engaged in precisely that prohibited form of advertising. JA120.

establish the malicious prosecution elements for that claim either. That Sega cannot prevail on the only claim that is excepted from the privilege is no reason to create a new carveout from the privilege in this case.

Sega's argument below boiled down to the view that there should be an additional exception to the privilege for the *Hensley* petition and mass arbitrations. But there is also nothing exceptional about those filings. The *Hensley* petition was a run-of-mill filing just like any other petition to compel arbitration, and Consovoy's clients prevailed on it. Likewise, Consovoy filed its clients' arbitration demands with JAMS exactly as Sega's EULA required. The fact that Consovoy has over 19,000 clients with claims against Sega doesn't change anything. The California Legislature itself has recognized mass arbitrations are common vehicles for vindicating individual's claims against big companies by passing laws to ensure that companies pay the arbitration fees associated with them. *See supra* 6-7. Courts have recognized the soundness of mass arbitrations too. *See supra* 5-6 (collecting cases).

In fact, the Washington Court of Appeals recently held that a lawsuit identical to Sega's against Consovoy was barred by its state's litigation privilege. "The conduct [the plaintiff] complains of—the filing of thousands of individual arbitration requests—is a direct result of its own agreement barring class actions and prohibiting collective or representative arbitration." *Valve Corp. v. Bucher Law PLLC*, 34 Wash. App. 2d 727, 742-43 (2025). "Such conduct is part of a legal practice and is directly

related to representing clients, which is precisely the kind of conduct the litigation privilege is designed to protect." *Id*. at 743. Given all this, there is nothing that could lead the Fourth Circuit to carve out an exception to the litigation privilege that the Supreme Court of California itself hasn't identified.

> 2. **The litigation privilege bars Sega's false advertising claim because Consovoy's advertisements are protected pre-suit activity.**

Litigation privilege also bars Sega's state-law false advertising claim. Here again, the Supreme Court of California has explained that "California courts have given the privilege an expansive reach." *Rubin*, 4 Cal. 4th at 1193-94. And that court has repeatedly "reemphasized the importance of virtually unhindered access to the courts." *Id.* The litigation privilege's protections, as a result, extend beyond just filing lawsuits. "In light of this extensive history," the court explained "it is late in the day to contend that communications with 'some relation' to an *anticipated* lawsuit are not within the privilege." *Id.* at 1194-95 (collecting cases). The court has therefore held that "attorney prelitigation solicitations of potential clients" are "protected by the litigation privilege." *Rusheen*, 37 Cal. 4th at 1058; *see also Rubin*, 4 Cal. 4th at 1194-96.

These principles apply here to bar Sega's fourth claim for false advertising. That claim alleges that Consovoy solicited clients with claims against Sega. "To help find potential claimants, Consovoy … purchased ads on Instagram, Facebook, and

YouTube." JA090, ¶40. The first alleged advertisement stated that "[i]f you played any of the following games, you may qualify for hundreds of dollars in compensation." JA091, ¶41. The second alleged advertisement stated that "[y]ou likely qualify for hundreds of dollars in compensation" if the recipient of the advertisement played specific Sega games. JA091, ¶42. There can be no doubt, then, that the basis for Sega's false advertising claim is "attorney prelitigation solicitations of potential clients." *Rusheen*, 37 Cal. 4th at 1058. The litigation privilege thus applies to Sega's false advertising claim under state law.

### III.    *Noerr-Pennington* **immunity bars Sega's Lanham Act claim.**

Sega's Lanham Act claim against Consovoy parallels its false advertising claim under state law. Sega's theory is, in effect, that Consovoy should be held liable under the Lanham Act because it used advertising to successfully solicit too many individuals with claims against Sega. JA090, ¶40; JA104, ¶98. *Noerr-Pennington* bars that theory.

### A.    *Noerr-Pennington* **immunity bars Sega's Lanham Act claim because Consovoy's advertisements are protected pre-suit activity.**

Sega didn't dispute below that *Noerr-Pennington* applies to Lanham Act claims. Nor did it dispute that *Noerr-Pennington* extends to pre-suit conduct, including that it applies to attorneys soliciting clients in anticipation of litigation. With good reason. "[C]ourts have generally shown a willingness to immunize 'conduct incidental to the prosecution of the suit.'" *Navient Sols.*, 136 F.4th at 525

(citing *Baltimore Scrap*, 237 F.3d at 401). "[T]he majority of other circuits" have "extend[ed] *Noerr-Pennington* immunity to litigation-related activities preliminary to the formal filing of the litigation." *Id.* (quoting *Sosa*, 437 F.3d at 937) (cleaned up); *see also Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 100 (2d Cir. 2000) ("Courts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation.") (collecting cases). The reason for that extension is obvious. Courts "must give adequate 'breaching space' to the right of petition." *Sosa*, 437 F.3d at 932 (quoting *BE & K Const.*, 536 U.S. at 531). "Given that petitioning immunity protects … litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation." *Coastal States Mktg.*, 694 F.2d at 1367.

Advertising to potential clients falls squarely within those acts that are "reasonably and normally attendant upon effective litigation." *Id.* The first step in pursuing litigation, after all, is typically the formation of the attorney-client relationship. In addition, "[t]he Supreme Court has regularly reaffirmed the protected status of attorney advertising, extending First Amendment coverage to a variety of forms of lawyer advertising embodying a wide range of content." *Ficker v. Curran*, 119 F.3d 1150, 1151 (4th Cir. 1997). And "an attorney's First Amendment right to advertise necessarily includes the right to tailor the content of the ad to persons with specific legal problems." *Id.* at 1152. The purpose of *Noerr-*

*Pennington* immunity—safeguarding First Amendment rights—further supports applying the immunity to attorney advertising made in anticipation of litigation.

With the standard set, the question is whether Consovoy's alleged advertisement were created in anticipation of litigation. They plainly were, as already explained for Sega's false advertising claim under state law. *See supra* 37-38. The alleged advertisements, as a result, are protected by *Noerr-Pennington* immunity. And Courts have concluded that *Noerr-Pennington* immunity applies in analogous circumstances. "Where companies notify customers about a lawsuit and their intent to pursue legal rights," for example," those communications are protected." *UCP Int'l Co. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 983 (N.D. Cal. 2019). The doctrine applies specifically to the type of communications on which Sega bases its allegations—notifying "purchasers or potential purchasers of [a company's] products" about litigation. *Sliding Door Co. v. KLS Doors, LLC*, 2013 WL 2090298, at *2 (C.D. Cal. May 1, 2013); *see, e.g.*, *AirHawk Int'l, LLC v. TheRealCraigJ, LLC*, 2017 WL 3891214, at *3 (C.D. Cal. Jan. 19, 2017) (where a "communication informs the customers about [a] suit" against a company, "the *Noerr-Pennington* doctrine bars the [company's] Lanham Act claims"). This Court should do the same.

**B.** **Sega's arguments against applying *Noerr-Pennington* immunity here fail.**

Sega proffered only two arguments below for why *Noerr-Pennington* immunity doesn't bar its Lanham Act claim: (1) *Noerr-Pennington* immunity doesn't extend to arbitrations; and (2) the Consovoy's clients' litigation against Sega is a "sham" not entitled to *Noerr-Pennington* immunity. JA146-47. Neither argument holds water.

**1.** Sega's first argument fails out of the gate. Sega's Lanham Act claim doesn't target arbitration proceedings. The claim targets the *advertising* through which Consovoy procured clients, not the arbitrations themselves. JA103, ¶¶96-97. And the advertisements say nothing about arbitration; they merely advertise potential claims that recipients may have against Sega. JA090-92, ¶¶41-42. Sega seemed to suggest below that the advertisements were conduct in arbitrations because they led to Consovoy's clients filing arbitration demands. JA146. But that is no help to Sega either. The alleged ads also led to Consovoy filing a court action on its clients' behalf—the successful *Hensley* petition. *Hensley*, 2024 WL 5466122, at *7. Sega's Lanham Act claim, as a result, is not based on the arbitrations.

Even setting that aside, however, *Noerr-Pennington* immunity extends to conduct in arbitrations. This Court has not yet decided whether *Noerr-Pennington* reaches arbitrations. *Navient Sols.*, 136 F.4th at 525 (withholding judgment on the issue). And judges have split on that question. *Compare Eurotech, Inc. v. Cosmos*

*Eur. Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 392 (E.D. Va. 2002), *with Ford Motor*, 972 F. Supp. 2d at 866. But courts have extended *Noerr-Pennington* to all manner of conduct incident to litigation separate the venue where the parties' disputes are adjudicated. They've held that *Noerr-Pennington* applies threats of litigation, settlement offers, and third-party funding of litigation, to name just a few. *Sosa*, 437 F.3d at 936-37 (collecting cases); *see also Baltimore Scrap*, 237 F.3d at 400-01. Just as in those contexts, "arbitration" is "part of the adjudicatory process and thus warrant *Noerr-Pennington* immunity." *Eurotech*, 189 F. Supp. 2d at 393.

The courts that have not applied *Noerr-Pennington* to arbitrations have done so because they concluded that arbitrations "do[] not petition the petition the Government at all" through judicial proceedings. *Ford Motor*, 972 F. Supp. 2d at 868. Yet that's not right. Arbitrations are merely a component of our civil justice system that courts ultimately govern. To start with, courts always have "the obligation to insure that the arbitrator has acted within the contractually-boundaries of his authority." *Champion Int'l Corp. v. United Paperworks Int'l Union, AFL-CIO*, 168 F.3d 725, 728 (4th Cir. 1999). "[A]n arbitrator ... does not sit to dispense his own brand of industrial justice." *Id.*

Congress has also ensured that courts have a significant role to play in the arbitral process when it passed the Federal Arbitration Act. *See* 9 U.S.C. §§1-16. Most immediately, an arbitral award has no binding effect on its own. The prevailing

party must first go to a court to confirm the award and reduce it to a court judgment before the award can be enforced. *See id.* §§9, 13. The losing party also must go to court to vacate an arbitral award. *Id.* §10. And either party can go to court to modify an award. *Id.* §§11-12. Congress also directed courts to appoint arbitrators if necessary, *id.* §5, hear motions related to the underlying arbitration, *id.* §6, and compel attendance of witnesses in arbitration, *id.* §7. Courts also have the authority to enjoin arbitrations from proceeding. *See, e.g.*, *Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 116 (4th Cir. 1993). To be sure, courts have less authority over arbitrations than they do most cases within their jurisdiction. But courts play a central to the arbitral process. Actions taken in arbitration, then, necessarily must involve petitioning activity to courts.

**2.** Sega next argues that *Noerr-Pennington* immunity shouldn't apply because Consovoy's clients have engaged in "sham" litigation. JA146-47. The Supreme Court has "set forth a two-part definition of 'sham litigation.'" *Waugh Chapel*, 728 F.3d at 363 (cleaned up). "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* "The second inquiry focuses on the 'litigant's subjective motivation and whether the baseless lawsuit conceals an attempt to' violate federal law 'through the use of the governmental process." *Id.* (cleaned up).

The only litigation that has even formally started as of the date this brief was filed is the *Hensley* petition compel arbitration in Los Angeles Superior Court. And again, Consovoy's clients *prevailed* on that petition. *Hensley*, 2024 WL 5466122, at *7. "By definition, a winning lawsuit is a 'reasonable effort at petitioning for redress and therefore not a sham.'" *Baltimore Scrap*, 237 F.3d at 399. The *Hensley* petition thus cannot qualify as "sham" litigation.

Sega responds that the underlying arbitrations themselves are a "sham." JA146-47. Before the district court, Sega pointed to the alternative test for sham litigation the Supreme Court articulated in *California Motor*. *Id.* This Court has explained that "when purported sham litigation encompasses a series of legal proceedings rather than a singular legal action, … the sham litigation standard of *California Motor* should govern." *Waugh Chapel*, 728 F.3d at 364. That test asked whether the defendant "filed (or directed) a series of legal proceedings without regard for the merits and for the purposes of violating federal law." *Id.*

Sega's theory under *California Motor* fails for three independent reasons. *First,* and once again, Sega's Lanham Act claim doesn't even target any "sham" filings. Sega seeks to hold Consovoy liable merely for its attorney advertising. Attorney advertising is not litigation at all, much less "sham" litigation.

*Second*, not a single arbitration by Consovoy's clients has formally started yet. *See supra* 20-21. The very first factor this court looks at under *California Motors* is

whether the collateral litigation was filed "without regard for the merits." *Waugh Chapel*, 728 F.3d at 364-65 (addressing the merits of the litigation). To do that, courts look at the "win-loss percentage" of that litigation. *Id.* at 365 (collecting cases). In *Waugh*, for example, this Court found it important that "the vast majority of legal challenges failed demonstrably." *Id.* at 364. But here, the only piece of litigation that has moved forward was the successful *Hensley* petition. Categorially, then, there hasn't been any "pattern" of proceedings, must less "a pattern of baseless, repetitive claims" as Sega contended below. JA146-47. Nothing has happened yet on the merits of the arbitrations.

*Third*, Sega's complaint doesn't allege that Consovoy used its clients' arbitrations "for the purposes of violating federal law." *Waugh Chapel*, 728 F.3d at 364. In the antitrust context, for example, this inquiry looks at whether "the litigation activity" itself "constituted anti-competitive conduct." *Id.* at 363. In other words, the court asks whether the litigation activity was a tool the defendant used to accomplish a violation of the Sherman Act's prohibition on anti-competitive behavior. *Id.* So here the question is this: Does Sega's complaint allege that Consovoy filed its clients' arbitrations as a tool to violate the Lanham Act's prohibitions on false advertising? But Sega doesn't allege that used the arbitrations as a tool to violate the Lanham Act. Nor could it. The alleged false advertising happened *before* Consovoy

filed its clients' arbitrations. It would be an odd fit, to say the least, to argue that the arbitrations' purpose was to violate the Lanham Act.

Even setting aside these threshold defects, Sega cannot prevail on the merits of the *California Motor* standard. Start with the arbitrations' merits. Sega claimed below that the arbitrations' legal theory is "baseless." JA147. But the arbitrations' claims are based on controlling California precedent. The arbitrations allege that Sega unlawfully targeted Consovoy clients with advertising based on their gender and age. JA120. Binding precedent establishes that conduct violates California's Unruh Civil Rights Act. *See Liapes*, 95 Cal. App. 5th at 920-27. In *Liapes*, the plaintiff alleged that "Facebook expressly relies on gender and age to determine the audience for its ads." *Id.* at 926. As a result, the court held, "the complaint raises a plausible inference Facebook treated Liapes unequally because of her gender and age—a valid Unruh Civil Rights Act claim for intentional discrimination." *Id.*

Each of Consovoy's clients have made allegations in their arbitration demands that are materially identical to those in *Liapes*. *See* JA120. The demands outline how "Sega uses its customers 'age or date of birth and gender' for its 'marketing and advertising purposes'" and how Sega partners with Facebook—the defendant in *Liapes* itself—to facilitate advertisers using the "age and gender of the customers you want to see your ads" on Sega's platform. *Id.* Consovoy's clients have alleged the very theory that *Liapes* sustained.

Sega otherwise argued below that Consovoy merely filing thousands of arbitrations on behalf of its clients is "abusive" and, as a result, they are shams. *See* JA147. But mass arbitrations are now a common vehicle for vindicating the rights of consumers who are forced into arbitration. *See supra* 5-6 (collecting cases). Law firms that file mass arbitrations are merely doing *exactly* what the business community said to do when that community justified arbitration in lieu of class actions. *See supra* 4-5. Indeed, consumers like Consovoy's clients have no other place to go to adjudicate their claims *because of* the companies' arbitration agreements. And the California Legislature specifically blessed mass arbitrations when it passed laws to ensure that companies like Sega pay the arbitration fees to ensure those arbitrations proceed. *See supra* 6-7; *Hohenshelt*, 573 P.3d at 953-54. As to the arbitral fees that JAMS has charged Sega, courts have repeatedly rejected companies' claims that those fees are unfair, since the companies' *own* agreements choose the arbitral forums over permitting class actions and require that the fees be paid so the arbitrations can proceed. *Abernathy*, 438 F. Supp. 3d at 1068 (rejecting the "hypocrisy" of when a company "blanches at the cost of the filing fees it agreed to pay in the arbitration clause"); *supra* 5-6 (collecting cases).

For these reasons, the "sham" exception to *Noerr-Pennington* immunity doesn't apply.

## CONCLUSION

This Court should reverse the district court's denial of Consovoy's motion to dismiss.

Dated: October 17, 2025

Respectfully submitted,

*/s/ Bryan Weir*
Thomas R. McCarthy
Bryan Weir
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
bryan@consovoymccarthy.com

*Counsel for Consovoy McCarthy PLLC*

**STATEMENT REGARDING ORAL ARGUMENT**

Because this case presents important and novel questions about the scope of immunities at the core of the attorney-client relationship, Consovoy respectfully requests oral argument.

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7)(B) because it contains 11,348 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word for Mac in 14-point Times New Roman font.

Dated: October 17, 2025                    */s/ Bryan Weir*

**CERTIFICATE OF SERVICE**

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: October 17, 2025                    */s/ Bryan Weir*